# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**CHARLES ANTHONY MORALES,**

      **Plaintiff,**

**v.**                                        **No. CIV-16-380 LAM**

**NANCY A. BERRYHILL, Acting Commissioner**
**of the Social Security Administration,**

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on *Plaintiff's Motion to Reverse or Remand Administrative Agency Decision* (*Doc. 15*) and his memorandum in support (*Doc. 16*), both filed October 3, 2016 (hereinafter, collectively, "motion"). On January 4, 2017, Defendant filed a response (*Doc. 20*) to Plaintiff's motion and, on January 23, 2017, Plaintiff filed a reply (*Doc. 21*). In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case. *See* [*Docs. 4* and *7*]. The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 12*]. For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **DENIED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **AFFIRMED**.

.

# I.   Procedural History

On January 9, 2012 (*Doc. 12-9* at 2), Plaintiff protectively filed an application for Supplemental Security Income (hereinafter "SSI").  Plaintiff's application was denied at the initial level on June 12, 2012 (*Doc. 12-5* at 2), and at the reconsideration level on February 28, 2013 (*id*. at 3).   On March 13, 2013, Plaintiff requested a hearing to review the denial of his application.   *See* [*Doc. 12-6* at 9].   Administrative Law Judge Barry O'Melinn (hereinafter "ALJ") conducted a video hearing on June 18, 2014.   [*Doc. 12-4* at 2-42].   Plaintiff appeared, represented by attorney Patricia Glazek, and testified.   *Id*. at 8-30, 39-41.   Vocational Expert Mary Diane Weber (hereinafter "VE") also appeared and testified.   *Id.* at 30-38.

On August 27, 2014, the ALJ issued a decision (*Doc. 12-3* at 22-32) finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled from the date his application was filed (*id*. at 32).   Plaintiff requested that the Appeals Council review the ALJ's decision.   *Id*. at 16.   On March 18, 2016, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision."   *Id*. at 2.   The Appeals Council indicated that it had "looked at an incident report dated October 27, 2014 (4 pages)," which "new information is about a later time" and "does not affect the decision about whether you were disabled beginning on or before August 27, 2014," the date of the ALJ's decision.[1]   *Id*. at 3.   This decision was the final decision of the Commissioner.   On May 4, 2016, Plaintiff filed his complaint in this case.   [*Doc. 1*].

---

[1] The Appeals Council did not make the incident report a part of the administrative record, which suggests the report was rejected rather than considered.   It is, however, attached as an exhibit to Plaintiff's motion.   *See* [*Doc. 16-1* at 2-5].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)).   If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief.   *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).   A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.   *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted).   An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted).   While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."   *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted).   "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."   *Lax v.*

*Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## III.   Applicable Law and Sequential Evaluation Process

For purposes of SSI, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).   In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).   At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

## IV.   Plaintiff's Age, Education, Work Experience,and Medical History; and the ALJ's Decision

Plaintiff was born on March 23, 1965, and was 46 years old on January 9, 2012, the date he filed his disability application.   [*Doc. 12-9* at 2].   Thus, for the purposes of his disability claim, Plaintiff is considered to be a "younger person."[2]   Prior to filing his SSI application in 2012, Plaintiff last worked in August of 2011.   *Id.* at 6-7, 29.   In his application, Plaintiff claimed to be disabled due to PTSD, "anger issues," head injury, hepatitis C, liver disease, "mental and physical disabilities," and drug and alcohol addiction.   *Id.* at 6.   Although Plaintiff indicated in his application that he stopped working in 2011 because he "wasn't able to afford paying for things that were necessary for the job [he] was hired to do," he also stated that his conditions became severe enough to keep him from working on January 1, 2009.   *Id.*   Plaintiff has spent much of his life in custody, both as a minor and as an adult, and has been convicted of felonies.   *See* [*Doc. 12-11* at 14-21].   Although he did not complete high school, he obtained a GED while in custody of the New Mexico Boys School, and indicated that he "attended college in prison," and had completed one year of college.   [*Doc. 12-4* at 11; *Doc. 12-9* at 7].   Plaintiff reported that most of his legal troubles involved alcohol and drug use, but that he had been clean and sober for 14 years as of the date of the hearing.   [*Doc. 12-4* at 12-13, 26; Doc. *12-14* at 8].   Plaintiff does not dispute the ALJ's determination that his alleged physical conditions are not disabling and, therefore, this appeal is solely limited to whether or not his mental conditions render him disabled.

_____

[2] *See* 20 C.F.R. § 404.1563(c) (defining a "younger person" as "under age 50").

Plaintiff's medical records include:   Psychological Evaluation dated July 27, 2004 from John G. Lang, Ph.D. (*Doc. 12-12* at 26-29); consultative mental status evaluation dated March 26, 2010 by Steve Sandoval Martinez, Ph.D. (*Doc. 12-14* at 8-10); mental status examination dated March 29, 2011 from Dan Hendricks, Ph.D. (*id*. at 11-15); treatment records for the periods from November 19, 2009 to September 20, 2011 (*Doc. 12-15* at 3-20), from January 14, 2012 to February 14, 2012 (*Doc. 12-16* at 3-13), and from November 19, 2009 to June 5, 2013 (*Doc. 12-20* at 2 through *Doc. 12-22* at 22) from Life Link; psychological evaluation report dated May 12, 2012 by Robert Krueger, Ph.D. (*Doc. 12-17* at 3-7); neuropsychological evaluation dated June 10, 2012 from Gerald L. Russell, Ph.D. (*id*. at 22-29); psychiatric review technique (*id*. at 30-42) and mental RFC assessment (*Doc. 12-18* at 2-4), both dated June 11, 2012, from Diane Kogut, Ph.D.; and treating source opinion regarding ability to do mental work-related activity dated May 22, 2014 (*Doc. 12-22* at 32-33) and treatment records for the period from February 17, 2014 to April 3, 2014 (*Doc. 12-23* at 2-6) from Carolyn Tjoland, LPCC.   Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the filing of his disability application on January 9, 2012.   [*Doc. 12-3* at 24].   At step two, the ALJ found that Plaintiff has the following severe impairments:   "anxiety, affective disorder, personality and organic brain disorders, and back disorder."   *Id*.   At the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" found in 20 C.F.R. Part 404, Subpt. P, Appx 1 (20 CFR §§ 416.920(d), 416.925, and 416.926).   *Id.*   The ALJ considered Listing 1.04 (Disorders of the Spine), and found that Plaintiff's back disorder did not meet or equal its criteria.   *Id*. at 24-25.   Regarding Plaintiff's

mental impairments, the ALJ considered Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), and 12.06 (Anxiety Related Disorders), and determined that Plaintiff has mild restriction of his activities of daily living, moderate difficulties with social functioning, moderate difficulties with concentration, persistence or pace, and has experienced no episodes of decompensation of extended duration.  *Id.* at 25-26.  From those findings, the ALJ concluded that Plaintiff's impairments did not satisfy the criteria of either Paragraph B (severity of mental limitations) or Paragraph C (durational and functional requirements) of the Listings considered. *Id.* at 26.  Before step four, the ALJ found that Plaintiff had the RFC:

> [T]o perform medium work as defined in 20 CFR 416.967(c).  [Plaintiff] can understand, remember, and carry out simple instructions.  Further, he is able to make simple work related decisions and respond appropriately to supervision, co-workers, and work situations.  [Plaintiff] is able to handle routine changes in the work setting, maintain concentration, persistence, and pace for up to and including two hours at a time with normal breaks throughout the workday.  He should have no interaction with the public, only occasional contact with co-workers, and the work must be isolated with only occasional supervision.

*Id.*  In support of this RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  *Id.* at 27.

At step four, the ALJ found that Plaintiff is unable to perform his past relevant work.  *Id.* at 31.  At step five, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform.  *Id.*  In support of this finding, the ALJ relied on the VE's testimony that an individual of Plaintiff's age, with the same education, work experience, and RFC, could

perform representative jobs such as industrial cleaner (DOT[3] 381.687-018), "dishwasher" (DOT 318.687.010),[4] and hand packager (DOT 920.587-018), all of which are medium exertional level, SVP[5] 2, jobs.   *Id*. at 32.   Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act "since January 9, 2012, the date the application was filed."   *Id*.

## V.   Analysis

Plaintiff argues in his motion that:   (1) the ALJ erred by improperly evaluating the medical evidence relating to Plaintiff's mental functioning, resulting in an inaccurate and insufficiently supported mental RFC (*Doc. 16* at 18-25); and (2) the Appeals Council improperly rejected evidence that was new, material, and temporally relevant to the ALJ's decision (*id*. at 25-26).   In response, Defendant argues that the ALJ properly considered and weighed the medical opinions regarding Plaintiff's mental disorders, and Plaintiff's RFC is supported by substantial evidence (*Doc. 20* at 4-10); and (2) the evidence rejected by the Appeals Council is not part of the record and should not be considered by the Court (*id*. at 11-12).   In his reply, Plaintiff

---

[3] DOT stands for Dictionary of Occupational Titles, which is available at http://www.occupationalinfo.org/ (site last visited March 9, 2017).

[4] Although the VE identified the position with this DOT number as "dishwasher" (*Doc. 12-4* at 33), the DOT itself identifies the job as "kitchen helper."   *See*   http://www.occupationalinfo.org/31/318687010.html (site last visited March 9, 2017).

[5] SVP stands for Specific Vocational Preparation, which is a rating of the amount of time it takes "a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   Dictionary of Occupational Titles (4th ed., rev. 1991), App. C(II), 1991 WL 688702. SVP level 2 jobs require "[a]nything beyond [a] short demonstration up to and including one month" of such preparation.   *Id*.   A job with an SVP rating of 1 or 2 is considered "unskilled work."   POMS-DI-25001.00-B-88, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#b88 (site last visited March 9, 2017).

contends that Defendant fails to respond to several of Plaintiff's arguments, offers "post-hoc" reasons for the ALJ's decision, and cites inapt cases in support of her contentions.   [*Doc. 21*].

## A.   The ALJ's Assessment of Plaintiff's Mental Impairments

The case presents the interesting issue of whether someone must be determined to be "disabled" from gainful employment based on a history of difficulty "getting along" with others. Plaintiff reports having an abusive childhood, a long history of alcohol and drug abuse, and a series of erratic and short-term jobs.  *See, e.g.,* [*Doc. 12-4* at 9-12, 15-18, 27-29].   As noted above, he reported a similar history, including a violent and chaotic childhood (*Doc. 12-17* at 4), to a variety of mental health professionals.   As Plaintiff points out, there is significant evidence from which the ALJ could have determined that Plaintiff's mental conditions render him "unable" to engage in substantially gainful employment, which is a component of a valid disability claim.   However, the ALJ determined that Plaintiff is capable of working, so long as his interactions with co-workers, supervisors, and the general public are limited.   In so concluding, the ALJ relied on at least one acceptable medical source's opinion, Plaintiff's own accounts, and what he considered to be flaws in some of the other medical source opinions.   There is no question that the outcome of Plaintiff's claim could have been "disabled" as well.   However, it is not the job of the courts to re-weigh the evidence, or to second-guess the ALJ's decision, and "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).   Thus, this Court's inquiry is limited to whether or not the ALJ's decision is supported by substantial evidence.

The medical source evidence consists of seven mental health opinions that were rendered between July 2004 and May 2014.   All sources indicate that Plaintiff has some degree of

impairment with respect to social interaction, with most indicating that the impairment is significant.   The opinions in the record are as follows:

1.     **John G. Lang, Ph.D.**:   July 27, 2004 Psychological Evaluation (*Doc. 12-12* at 26-29);[6]

2.     **Steve Sandoval Martinez, Ph.D.**:   March 26, 2010 consultative mental status evaluation (*Doc. 12-14* at 8-10);

3.     **Dan Hendricks, Ph.D.**:   March 28, 2011 Mental Status Examination (*Doc. 12-14* at 11-15);

4.     **Robert Krueger, Ph.D.**:   May 10, 2012 Psychological Evaluation (*Doc. 12-17* at 3-7);

5.     **Gerald L. Russell, Ph.D.**:   June 6, 2012 Neuropsychological Evaluation (*Id.* at 22-29);

6.     **Diane Kogut, Ph.D.**:   June 11, 2012 Mental RFC and Psychiatric Review Technique (*Id.* at 30-42);

7.     **Nicholas Brown, LMHC**:   January 15, 2013 correspondence (*Doc. 12-16* at 3); and

8.     **Carolyn Tjoland, LPCC**:   May 27, 2014 Opinion re Ability to Do Mental Work-Related Activity (*Doc. 12-22* at 32-33).

Of these eight sources, only treating therapists Nicholas Brown and Carolyn Tjoland had ever met Plaintiff before their evaluation of him, and one of them, Dr. Kogut, never met him at all.

Dr. Lang indicated that Plaintiff had been referred to him by his rehabilitation counselor. [*Doc. 12-12* at 26].   Although he noted that Plaintiff had "a long history of criminal behavior,

---

[6] Although the ALJ did not specifically discuss Dr. Lang's evaluation, he did indicate that he had "considered the complete medical history consistent with 20 CFR 416.912(d)." [*Doc. 12-3* at 22].   In addition, Plaintiff contends that the ALJ should have discussed Dr. Lang's opinion.   [*Doc. 16* at 19].

incarceration and treatment for drugs and alcohol" (*id*.), and that Plaintiff had "made it clear that all his crimes were drug and alcohol-related," Dr. Lang indicated that, at the time of the evaluation, Plaintiff was "two years drug and alcohol free, attends regular AA meetings and talks to his sponsor daily (*id*. at 27). Dr. Lang noted that Plaintiff "makes a good impression," and "[o]ne would not suspect that he has a criminal history" (*id*.), that Plaintiff "still has anger and resentment," and "at times he presents as very coarse, blunt and unsophisticated," which Dr. Lang attributed to "socialization within a prison setting" (*id*. at 28). He further noted that Plaintiff "may act inappropriately and evidence poor judgment" and "has potential to act out," but that "[a]s long as he is drug and alcohol-free, there is hope that he may find a place for himself." *Id*. He assigned Plaintiff a GAF score[7] of 55, which indicates moderate symptoms, described Plaintiff as "sensitive and suspicious," and noted that "[i]t is difficult for him to trust people," but that he "is realistic about his past and knows how difficult it will be to get on his feet at this time." *Id*. at 29.

Dr. Martinez saw Plaintiff nearly six years later, in March 2010, for the purpose of ruling out PTSD and alcohol abuse. [*Doc. 12-14* at 8]. He noted that Plaintiff drove himself to the interview, was well dressed, well groomed and "initially well mannered," but "was evasive and the integrity of his clinical interview responses was questionable at times. *Id*. Dr. Martinez noted that Plaintiff "denie[d] that he has ever experienced a level of trauma that would justify a [PTSD] diagnosis," and also denied "any symptoms associated with depression, PTSD or other anxiety

---

[7] The Global Assessment of Functioning ("GAF") score is a measurement of the clinician's judgment of an individual's psychological, social and occupational functioning, and should not include impairment in functioning due to physical or environmental limitations. DSM-IV-TR at 32. A score within the range of 51 to 60 indicates a clinical assessment of "[m]oderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*. at 34.

disorders." *Id*.   Plaintiff reported that he was not taking any prescribed medications, that he "enjoys a supportive relationship with his mother," that he "has never held a job for more than 6 months," and that he had "lost various positions because he had lied on his employment application forms." *Id*. at 8-9.   Dr. Martinez noted that Plaintiff "reads throughout the day and spends time taking care of his living quarters and visiting with family members." *Id*. at 9. Dr. Martinez further noted that Plaintiff's "insight and social judgment [we]re poor," and he "displayed impulsivity during the course of the examination." *Id*.   However, Plaintiff was "alert and oriented in all spheres.   He denies memory or concentration deficits.   He reports reading deficits and this examiner also observed social comprehension deficits.   He appears to be average in intelligence. He is capable of monitoring his benefits." *Id*.   Dr. Martinez diagnosed Plaintiff with alcohol and substance abuse in full remission, discontinued his PTSD diagnosis, indicated possible antisocial personality disorder, and assigned him a GAF score of 44.[8]   *Id*.   In his prognosis for Plaintiff, Dr. Martinez stated that, "[b]y [Plaintiff's] own admission, his problems in findings [sic] competitive employment relate to his past criminal behaviors and his history of incarceration.   The mental condition affecting his inability to find employment seems to relate to his history of substance abuse and antisocial behaviors." *Id*. at 10.

Dr. Hendricks evaluated Plaintiff in March 2011, approximately a year after Dr. Martinez had seen Plaintiff.   He noted that Plaintiff reported "that he is not able to work because of problems getting along with others, PTSD, ADD, and background checks." [*Doc. 12-14* at 11].

---

[8]   A GAF score in the range of 41-50 is supposed to indicate "[s]erious symptoms" such as "suicidal ideation, severe obsessional rituals, [or] frequent shoplifting," or "serious impairment in social occupational or school functioning (e.g., no friends, unable to keep a job)."   DSM-IV-TR at 34.

Dr. Hendricks indicated that Plaintiff was a "fair reporter," and that he described his relationships with his mother and siblings as "good." *Id*. Dr. Hendricks observed that Plaintiff was going to anger management weekly, but that "[i]t does not appear that he benefits at all from this treatment. He seems too stubborn or rigid to accept what others advise him to do." *Id*. at 12. He noted that Plaintiff "was adamant about not taking antidepressants or anti-anxiety drugs because to him it would be loosing [sic] his sobriety." *Id*. Plaintiff related to Dr. Hendricks that he had "over 100 arrests/legal problems," that he had spent "most of his life in jail/prison," and that his "major stress is not being able to find employment." *Id*. Dr. Hendricks noted that Plaintiff "lies about his criminal record" in order to get jobs, and "is fired when they find out about his felonies." *Id*. Dr. Hendricks also noted that Plaintiff "appears quite rigid about following rules and easily gets angry. His temper and rigidity both interfere with maintaining employment." *Id*. He further noted that Plaintiff lived alone in a trailer and had a girlfriend of two years, but "does not have any friends other than at AA." *Id*. Dr. Hendricks observed Plaintiff to be both "cooperative and pleasant," described him as "neatly dressed and groomed," and noted that "[h]is typical mood was given as content." *Id*. at 13. He reported that Plaintiff had been angry the day before "when he and his girl friend [sic] had some miscommunications," then opined that "it appears that anger is a very frequent problem." *Id*. Dr. Hendricks related that Plaintiff's "problems" include, among other things, feelings of worthlessness and guilt, panic attacks, being rigid and suspicious, and having flashbacks of prison incidents. *Id*. However, Plaintiff's answers to certain questions Dr. Hendricks posed indicated that "he knows what is socially acceptable." *Id*.

Slightly more than a year later, Dr. Krueger also evaluated Plaintiff's mental status, indicating that one of the reasons for the referral was to "assist with processing of [Plaintiff's] disability claim." [*Doc. 12-17* at 3]. Dr. Krueger noted that Plaintiff reported having medical

problems, including hepatitis C, fatigue, abdominal swelling and discomfort, head injury, frequent headaches, left knee injury requiring surgery, and was not taking prescription medication.  *Id*. at 3-4.   Plaintiff described a chaotic and violent childhood, and reported "having emotional difficulties and a long history of behavior problems."  *Id*. at 4.   Dr. Krueger observed that, "[n]ot surprisingly, as an adult [Plaintiff] has had ongoing behavior problems with violence and anger management."  *Id*.   Dr. Krueger indicated that Plaintiff was "receiving some type of therapy through the Life Link program," where "his therapist believes that he should be taking antidepressant medication."  *Id*. at 5.   Plaintiff indicated that he lived in a trailer his mother had given him and "that he currently does not have relationships with his siblings."  *Id*.   Dr. Hendricks observed that Plaintiff was "physically tense," "expressed anger and frustration" during the interview, and reported that he had been trying to get SSI since 2004.  *Id*.   Plaintiff "described having strong tendencies for hypervigilance and for social avoidance," and Dr. Krueger noted that Plaintiff "clearly has chronic problems with anger management," and that his "personal history suggests that he is likely to have a personality disorder with antisocial features."  *Id*. at 6.   Dr. Krueger indicated that, although Plaintiff did not do well on a digit span test, "it is not known if he was making his best effort."  *Id*.   Dr. Krueger assigned Plaintiff a GAF score of 45-50, indicated that his medical records should be consulted for additional information, and reported that "[f]rom his self-report it appears that [Plaintiff] has serious and chronic problems with anger management," and "[h]e described having had problems with work relationships."  *Id*.   Dr. Krueger concluded that Plaintiff:

> does have significant functional impairment.   He has chronic emotional and behavioral problems, severe impairment with social functioning, and he may have some degree of cognitive impairment along with having chronic medical issues. His impaired social functioning is a highly significant issue because, realistically speaking, with a long history of felony convictions and incarceration [Plaintiff] will be excluded from most jobs.

*Id*. at 7.   Moreover, Dr. Krueger opined that Plaintiff "has a long history of problems with interpersonal relationships and social functioning, and he can be expected to have marked impairment in most relationships with coworkers, supervisors, and the general public."   *Id*.

Dr. Russell saw Plaintiff only a month later at the behest of Plaintiff's vocational counselor.   [*Doc. 12-17* at 22].   Plaintiff told Dr. Russell that he was frustrated regarding his inability to find a job and/or work with people," that he had "anger control issues," that he could not find work "because he has been in jail or prison for most of his life," and that "all of his incarcerations were drug and alcohol related."   *Id*.   Plaintiff also reported that he drove and had a driver's license, had been married twice, and had no children.   *Id*.   Dr. Russell used two tests to determine whether Plaintiff was unmotivated and/or malingering, and noted that "[h]is valid performances . . . suggested he was putting forth good effort on testing measures."   *Id*. Dr. Russell noted that Plaintiff obtained "a low average full scale IQ" score, that his language appeared within normal limits on most measurements, and that his vocabulary was "well below expectancy."   *Id*. at 24-25.   With respect to Plaintiff's psychological functioning, however, Plaintiff's "validity scales indicated [he] tended to portray himself in an especially negative or pathological manner," but Dr. Russell explained that, "[w]hile this pattern is often associated with a deliberate distortion of the clinical picture (i.e., malingering), alternative explanations include the possibility that the test results reflect a 'cry for help', or an extreme or exaggerated negative evaluation of oneself and one's life."   *Id*. at 25.   Nonetheless, Dr. Russell emphasized that Plaintiff's "TEST RESULTS POTENTIALLY INVOLVE CONSIDERABLE DISTORTION AND ARE UNLIKELY TO BE AN ACCURATE REFLECTION OF [HIS] OBJECTIVE CLINICAL STATUS."   *Id*.   Dr. Russell opined that Plaintiff's "impulsivity and drug use have likely led to severe impairment in his ability to maintain social role expectations, and his

recklessness has probably alienated most of the people who were once close to him." *Id.*

Dr. Russell also found that Plaintiff:

> is extremely sensitive in his interactions with others and likely harbors strong
> feelings of resentment as a result of perceived slights and insults. He is quick to
> feel that he is being treated inequitably and often holds grudges against others, even
> if the perceived affront is unintentional. Consistent with the constellation of
> hyper-vigilance, suspiciousness, and resentment, he probably is seen by others as
> being quite hostile. Working relationships with others are likely to be very
> strained, despite any efforts by others to demonstrate support and assistance.

> \*        \*        \*

> His responses suggest that he is an individual who is easily angered, has difficulty
> controlling the expression of his anger, and is perceived by others as having a
> hostile, angry temperament. He is not intimidated by confrontation and he will
> tend to display his anger readily when it is experienced; he may be verbally
> aggressive at relatively low levels of provocation. More extreme displays of
> anger, including damage to property and threats to assault others, would not be
> unexpected. It is likely that those around him are intimidated by his temper and
> the potential for verbal abuse or displays of physical violence. It should also be
> noted that his risk for aggressive behavior is further exacerbated by the presence of
> a number of features, such as psychotic symptoms, a limited capacity for empathy,
> and affective lability, that have been found to be associated with increased potential
> for violence.

*Id.* at 26-27. Dr. Russell opined that Plaintiff appeared to "present with a significant degree of

depression and anxiety," that "[d]iscussion with him suggests that he also merits the diagnosis for

PTSD," in addition to "Personality Disorder NOS[9] with Antisocial, Borderline, Paranoid, and

Schizotypal Features," assigned him a GAF score of 55, and recommended that he receive

treatment. *Id.* at 28.

---

[9] "NOS" is used in clinical diagnoses to indicate that the diagnosis is "not otherwise specified," or does not meet formal criteria. *See* https://psychcentral.com/ask-the-therapist/2014/06/30/what-is-an-nos-diagnosis/ (site last visited March 16, 2017).

The next day, June 11, 2012, Dr. Kogut provided a mental RFC for Plaintiff based on his records.  Dr. Kogut considered Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders, and 12.08 (Personality Disorders).  [*Doc. 1-17* at 30].  She concluded that Plaintiff had the following medically determinable impairments: cognitive disorder NOS (Listing 12.02) (*id*. at 31), depressive disorder NOS (Listing 12.04) (*id*. at 33), "anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms," as evidenced by "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress" (Listing 12.06) (*id*. at 35), and antisocial disorder (Listing 12.08) (*id*. at 37).  Dr. Kogut determined that Plaintiff had mild restriction of his activities of daily living, and moderate difficulties with both social functioning and maintaining concentration, persistence, or pace.  *Id*. at 40.  In Section I of her mental RFC of Plaintiff, Dr. Kogut noted that he had no marked limitations, and seven moderate limitations out of twenty functions, all of which were in the areas of "Sustained Concentration and Persistence," "Social Interaction," and "Adaptation."  [*Doc. 12-18* at 2-3].  In Section III, Dr. Kogut noted that Plaintiff "can perform basic [activities of daily living], drive a car, do chores," and follow simple directions, and opined that:

> [G]AF is moderately limited per [Dr. Krueger's] function report but [Plaintiff] retains capacity for unskilled work.  [Plaintiff] is able to perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled)."

*Id*. at 4.

Therapist Nicholas Brown, who had been counseling Plaintiff at Life Link, provided a letter, dated January 15, 2013, in which he noted that he had worked with Plaintiff

> on anger management, communication and coping skills to help in managing his depression and anxiety.  While results have met some success he is easily

triggered into defensiveness, overwhelm [sic], anger, stress and in general he regularly experiences severe, specific fears and anxiety.  Often these show up in problems with maintaining healthy relationships with others because of his problematic personality traits such as impatience, being demanding, and resisting authority figures or those who might want to help him.

[Plaintiff] has been struggling to find employment and has been unable, I believe, largely because of his diagnosis.

[*Doc. 12-16* at 3].

Finally, on May 22, 2014, therapist Carolyn Tjoland rendered a check-box opinion regarding Plaintiff's ability to perform mental work-related activities.  [*Doc. 12-22* at 32-33]. The abilities are set forth in three categories, which are those "needed to do unskilled work," those "needed to do semiskilled and skilled work," and those "needed to do particular types of jobs." *Id*.  With respect to abilities needed for unskilled work, Ms. Tjoland indicated that Plaintiff had two such skills that she considered to be "unlimited or very good," three that she considered to be "limited," four that she felt would be "unable to meet competitive standards," and seven in which Plaintiff had "no useful ability to function."  *Id*. at 32.  Ms. Tjoland indicated that those assessments were "based on patient history and clinical observations as well as psychological evaluations completed by other providers over [a] period of years."  *Id*.

The ALJ considered and discussed each[10] of these opinions (*Doc 12-3* at 28-30), with the exception of Dr. Lang's, indicating that "[m]edical evidence of record dated before the [SSI filing] date of January 9, 2012, was considered only as a longitudinal guide regarding [Plaintiff]'s current

---

[10] Although the ALJ discussed Plaintiff's "March 2010" examination in the decision (*Doc. 12-3* at 28), he did not mention Dr. Martinez by name until later (*id*. at 30).

impairments."[11]   [*Doc. 12-3* at 28].   As for the other sources, the ALJ assigned "great weight" to Dr. Kogut (*id*. at 28); "little weight" to Doctors Martinez (*id*. at 30), Hendricks (*id*.), Krueger (*id*. at 28), and Russell (*id*. at 29); and "little weight" to therapists Brown (*id*. at 30) and Tjoland (*id*. at 29).   There were a number of reasons given by the ALJ for discounting some of the opinions. Principally, these were that:   (1) Plaintiff's activities of daily living (*e.g.,* having a driver's license and driving, cooking, jogging, biking, hiking, swimming, and independent living) are inconsistent with his complaints (*Doc. 12-3* at 25, 27); (2) Plaintiff has a demonstrated ability to work, and there is no evidence his condition has declined since he last did so (*id*. at 27-28); (3) although Plaintiff may have anger and antisocial traits, he refuses to take any mental health medications (*id*. at 28); (4) much of the opinion evidence was dependent on Plaintiff's subjective complaints, but his "reporting is unreliable" (*id*. at 28, 29); (5) Plaintiff's criminal and poor work histories are responsible for his inability to obtain jobs[12] (*id*. at 27); and (6) Plaintiff's ability to engage in social interaction is demonstrated by his fourteen-year commitment to AA, regular attendance at church and daily AA attendance, testimony and reports that he has friends at AA, "got along with his mother," and that he was "cooperative during his assessments" (*id*. at 28-29).

What Plaintiff seeks is this Court's reevaluation of the evidence based on his assertion that "the ALJ credited the opinions of a non-treating, non-examining, psychologist over those of five

---

[11] This statement would also apply to the opinions of Doctors Martinez and Hendricks, who each saw Plaintiff prior to the application filing date.

[12] In a case involving an incarcerated claimant, the Tenth Circuit affirmed denial of disability benefits because the claimant, who had "demonstrated habitual antisocial behavior," had not proven that his impairments were "responsible for or the cause of his unemployability," stating that "[o]ne cannot establish entitlement to disability benefits by proving that he has committed antisocial crimes resulting in his incarceration in prison."   *Kelbach v. Harris*, 634 F.2d 1304. 1312-13 (10th Cir. 1980).

examining psychologists."   [*Doc. 16* at 18].   This, the Court may not do.   The job of a reviewing court is simply to determine whether the ALJ's decision is supported by substantial evidence, regardless of whether a different result could have been reached.   *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.   In this case, the ALJ detailed the evidence, including the medical opinions,[13] and made a determination that Plaintiff retains the ability to perform work that exists in the national economy.   His RFC significantly restricts Plaintiff's interaction with co-workers, supervisors, and the public, and reduces his mental requirements to "simple" instructions and work-related decisions.   This RFC indicates that the ALJ saw "difficulty" where the Plaintiff insists there is "inability."   However, the evidence in this case could support either conclusion. Therefore, this Court cannot conclude that the ALJ's decision is not supported by substantial evidence, and the decision must be affirmed.

## B.   Plaintiff's Newly-Submitted Evidence

Plaintiff argues that the Appeals Council improperly rejected an October 27, 2014 incident report (*Doc. 16-1* at 2-5) (hereinafter "Incident Report"), which was submitted as new evidence. [*Doc. 16* at 25-26].   Defendant contends that, as the incident report is not part of the administrative record, the Court should not even consider this claim.   [*Doc. 20* at 11].   Under the regulations in effect at the time of the Appeals Council's decision, "[i]f new and material evidence

---

[13] Plaintiff asserts that the ALJ failed to "evaluate and assign weight to the psychological opinions based on all of the six factors specified in 20 C.F.R. § 416.927(c)."   [*Doc. 16* at 20].   While the Court agrees that it would have been preferable had the ALJ specifically identified those factors and discussed them where appropriate, it does not appear that the result would be any different had he done so.   All of the "acceptable source" opinions were from non-treating sources, and each source's "relationship" with the Plaintiff was clear.   Moreover, contrary to Plaintiff's claim that "the ALJ did not specify the evidence he concluded was inconsistent with and more credible than the psychologists's [sic] opinions" (*id.*), both the ALJ's discussion of each opinion and the above list of stated reasons for his disagreement establish that he did.

is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."   20 C.F.R. § 416.1570(b) (1987).   Thus, the Appeals Council will only consider additional evidence that is "new, material, and chronologically pertinent."   *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003).   In this case, the Appeals Council indicated that it had "looked at" the incident report and determined that it was about a later time than the one considered by the ALJ. [*Doc. 15-3* at 3].   This is a legal determination, which is reviewable by this Court *de novo*. *Threet*, 353 F.3d at 1191.

Plaintiff contends that the Incident Report is:   (1) "new because it is not duplicative or cumulative of evidence already of record"; (2) "material because it contradicts the ALJ's RFC finding that Plaintiff 'is able to respond appropriately [to] supervision, coworkers, and work situations"; and (3) "temporally relevant because it corroborates Dr. Russell's opinion that Plaintiff may engage in 'threats of assaults to others', and Ms. Tjoland's opinion that, when provoked, Plaintiff may react aggressively and impulsively, and be a potential danger to others." [*Doc. 16* at 26].   Defendant asserts that, because the report is not part of the administrative record, "th[is] Court cannot consider it, except to determine whether the case should be remanded" to the agency.   [*Doc. 20* at 11].   Remand to the Commissioner of Social Security for the taking of additional evidence "may" be ordered by a court, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."   42 U.S.C. § 405(g).   In this case, the report should have been made a part of the administrative record that was provided to this Court by Defendant, since the Appeals Council clearly indicated that the report had been submitted to and rejected by it. [*Doc. 12-3* at 2].   *See also* [*Doc. 16-1* at 1] (electronic receipt for attorney-supplied "Police

Report" on December 29, 2014).   In addition, if the evidence is "material," § 405(g) dictates that it be considered.   Therefore, the Court will consider the report.

Evidence is "new" if it is "not duplicative or cumulative of evidence already of record." 42 U.S.C. § 405(g).   New evidence is considered to be "material" if it might reasonably have led the agency to make a different decision.   *Mays v. Colvin*, 739 F.3d 569, 573 (10th Cir. 2014). Here, Plaintiff's new evidence describes a "verbal altercation," to which Albuquerque police responded, on October 27, 2014.   [*Doc. 16-1* at 3].   The officer writing the report indicated that two men who worked at an apartment complex that is managed by Plaintiff's girlfriend, "had an altercation" in the apartment office "with the new maintenance worker," Plaintiff, and that "they feared [Plaintiff] was going to try and hit them."   *Id*.   The officer spoke with Plaintiff's girlfriend, who reported that there had been an argument, but that "no fight or threat of violence occurred," and that Plaintiff had apologized to the other men for the incident.   *Id*.   The officer did not have contact with Plaintiff and, "at the wishes of the parties involved," the report was made simply to "document" the incident.   *Id*.

Plaintiff asserts that this document is material "because it contradicts the ALJ's RFC finding that Plaintiff 'is able to respond appropriately [to] supervision, co[-]workers, and work situations.'"   [*Doc. 16* at 26] (quoting *Doc. 12-3* at 26).   Even if the Court accepts Plaintiff's claim that the Incident Report is evidence that he has difficulty interacting with co-workers, the report is simply cumulative of opinions that were rejected by the ALJ (*See, e.g.,* [*Doc. 12-3* at 29] (rejecting the opinion of Carolyn Tjoland, LPCC that Plaintiff "had no ability to . . . be in proximity to others," and "could not interact appropriately with the public or maintain socially acceptable behavior"); and *id*. at 28 (rejecting the opinion of Robert Krueger, Ph.D. that Plaintiff has "marked limitation in in [sic] relationships with co-workers, supervisors, and the public")).

Thus, the ALJ was well aware of the claims that Plaintiff was "incapable" of engaging in appropriate behavior with others, but considered such claims to be overcome by evidence that indicated that he could do so, and in fact had successfully done so, including a fourteen-year commitment with AA, where he made friends; his regular attendance at church; and that, although Plaintiff had been able to work, he was hampered in his efforts to obtain work by his criminal history. *Id*. at 28-29.

Based on the cumulative nature of the Incident Report, the Court is skeptical that the report, though detailing an incident that occurred after the ALJ issued his decision, satisfies the standard of "new" evidence. Even more significantly, however, the Court does not consider the Incident Report to be supportive of Plaintiff's claimed "inability" to act appropriately with co-workers. In fact, the report suggests quite the opposite. What is does evidence is that Plaintiff obtained a job, at which he had a work-related argument with co-workers, but did not become threatening or violent, and he was composed enough to apologize to his co-workers afterward. Such a situation is not indicative of an "inability" to interact with others. At most, it suggests that Plaintiff may sometimes have difficulty doing so. The ALJ took that difficulty into account by limiting Plaintiff's RFC to "no interaction with the public, only occasional contact with co-workers, and the work must be isolated with only occasional supervision." *Id*. at 26. In sum, there is no "reasonable possibility" that the Incident Report would change the outcome of Plaintiff's case and, therefore, the Incident Report is not "material." This claim is without merit and will be denied.

---

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be affirmed.

**IT IS THEREFORE ORDERED** that *Plaintiff's Motion to Reverse or Remand Administrative Agency Decision* (*Doc. 15*) is **DENIED**, and the Commissioner's decision in this case is **AFFIRMED.**   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**